COLEMAN WAYNE GRAY

V.

COMMONWEALTH OF VIRGINIA

Record No. 860373

COLEMAN WAYNE GRAY

V.

COMMONWEALTH OF VIRGINIA

Record No. 860374

April 24, 1987

Present: Carrico, C.J., Cochran,* Poff, Compton, Stephenson, Russell, and Thomas, JJ.

---

* Justice Cochran participated in the hearing and decision of this case prior to the effective date of his retirement on April 20, 1987.

318

*James A. Moore (Carl E. Eason, Jr.; Moore & Saunders; Pretlow, Eason & Pretlow*, on brief), for appellant. (Record Nos. 860373 & 860374)

*Frank S. Ferguson, Assistant Attorney General (Mary Sue Terry, Attorney General*, on brief), for appellee. (Record Nos. 860373 & 860374)

STEPHENSON, J., delivered the opinion of the Court.

Coleman Wayne Gray was indicted for the capital murder of Richard M. McClelland in the commission of robbery, Code § 18.2-31(d), the robbery of McClelland, the abduction of McClelland, the use of a firearm in the commission of each of those felonies, and the arson of McClelland's automobile. The robbery occurred on May 2, 1985, at Murphy's Mart store in the City of Portsmouth where McClelland was the manager. A jury convicted Gray of all counts, fixing his punishment at life imprisonment on the robbery charge, life imprisonment on the abduction charge, 10 years in the penitentiary on the arson charge, and four years in the penitentiary on each of the firearm charges.

Pursuant to the bifurcated-trial procedure for capital murder cases, a separate penalty trial was conducted on the capital murder conviction. Code § 19.2-264.4. In the penalty trial, the Commonwealth presented evidence of aggravating factors and Gray introduced evidence in mitigation.

The jury fixed Gray's sentence at death. Following a sentencing hearing conducted pursuant to Code § 19.2-264.5, the trial court imposed the death sentence. Thereafter, the trial court entered judgments on all the verdicts.

We have consolidated the automatic review of Gray's death sentence with his appeal from his conviction of capital murder, Code §§ 17-110.1(A) and -110.1(F), and have given them priority on our docket, Code § 17-110.2. By order entered May 8, 1986, the appeals of the other convictions were certified from the Court of Appeals and consolidated with the capital murder appeal. Code § 17-116.06.

# I

## PRETRIAL PROCEEDINGS

### A

*Constitutionality of the Death Penalty Statute.*

■ Gray makes various challenges to Virginia's death penalty statute, each of which we have previously rejected. He first contends that the death penalty violates the proscription against cruel and unusual punishment contained in the Federal and Virginia Constitutions. In accord with our previous decisions, we again reject this contention. *See, e.g., Boggs* v. *Commonwealth,* 229 Va. 501, 505, 331 S.E.2d 407, 411 (1985), *cert. denied,* 475 U.S. 1031 (1986); *Stockton* v. *Commonwealth,* 227 Va. 124, 134, 314 S.E.2d 371, 378, *cert. denied,* 469 U.S. 873 (1984); *Whitley* v. *Commonwealth,* 223 Va. 66, 77-78, 286 S.E.2d 162, 168-69, *cert. denied,* 459 U.S. 882 (1982); *Bassett* v. *Commonwealth,* 222 Va. 844, 851, 284 S.E.2d 844, 849 (1981), *cert. denied,* 456 U.S. 938 (1982); *Stamper* v. *Commonwealth,* 220 Va. 260, 267, 257 S.E.2d 808, 814 (1979), *cert. denied,* 445 U.S. 972 (1980); *Mason* v. *Commonwealth,* 219 Va. 1091, 1095, 254 S.E.2d 116, 118-19, *cert. denied,* 444 U.S. 919 (1979); *Waye* v. *Commonwealth,* 219 Va. 683, 698-99, 251 S.E.2d 202, 211-12, *cert. denied,* 442 U.S. 924 (1979); *Smith* v. *Commonwealth,* 219 Va. 455, 476, 248 S.E.2d 135, 148 (1978), *cert. denied,* 441 U.S. 967 (1979).

■ Gray next contends that the aggravating factors which a jury must find in order to impose the death penalty, *see* Code § 19.2-264.2,[1] are unconstitutionally vague and overbroad and "an open invitation to allow an arbitrary and irrational decision." We reaffirm our previous rejection of this contention. *See, e.g., Watkins* v. *Commonwealth,* 229 Va. 469, 490, 331 S.E.2d 422,

---

[1] Code § 19.2-264.2 reads as follows:

In assessing the penalty of any person convicted of an offense for which the death penalty may be imposed, a sentence of death shall not be imposed unless the court or jury shall (1) after consideration of the past criminal record of convictions of the defendant, find that there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing serious threat to society or that his conduct in committing the offense for which he stands charged was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind or an aggravated battery to the victim; and (2) recommend that the penalty of death be imposed.

437-38 (1985), *cert. denied*, 475 U.S. 1099 (1986); *Stockton*, 227 Va. at 134-35, 314 S.E.2d at 378; *Bunch v. Commonwealth*, 225 Va. 423, 441, 304 S.E.2d 271, 281, *cert. denied*, 464 U.S. 977 (1983); *Smith*, 219 Va. at 476-78, 248 S.E.2d at 148-49.

■ Finally, Gray argues that Virginia's sentencing scheme is "overbroad, vague and facially unconstitutional" because Code § 19.2-264.2 allows a jury to examine an accused's "past criminal record" while Code § 19.2-264.4(C)[2] provides for examination of his "prior history." For reasons expressed in previous decisions, we again reject this argument. *See Watkins*, 229 Va. at 487, 331 S.E.2d at 435-36; *LeVasseur v. Commonwealth*, 225 Va. 564, 593-94, 304 S.E.2d 644, 660 (1983), *cert. denied*, 464 U.S. 1063 (1984).

## B

*Admissibility of Statements Made by Gray to the Police.*

Gray contends that his statements to the police were "involuntary." He argues that his statements were not voluntary under either the requirement set forth in *Miranda v. Arizona*, 384 U.S. 436 (1966), or the "totality of circumstances" standard.

Gray gave statements to the police on two occasions. The first statement was given to Officer Freeman on the morning of May 22, 1985. The second statement was given to Sergeant Lilley and Detective Bunker on the evening of May 23, 1985.

Freeman testified at the suppression hearing that at 8:30 a.m. on May 22, 1985, Gray, who was in a holding cell at the Suffolk jail, "shouted out that he wanted to talk to me." Freeman walked to the cell, and Gray said he "wanted to get something off his mind that had been bothering him."

Approximately 9:30 a.m., after Gray had eaten breakfast, he was brought to Freeman's office. Freeman told Gray that he would not talk to him unless Gray executed a "Legal Rights Ad-

---

[2] Code § 19.2-264.4(C) reads as follows:

The penalty of death shall not be imposed unless the Commonwealth shall prove beyond a reasonable doubt that there is a probability based upon evidence of the prior history of the defendant or of the circumstances surrounding the commission of the offense of which he is accused that he would commit criminal acts of violence that would constitute a continuing serious threat to society, or that his conduct in committing the offense was outrageously or wantonly vile, horrible or inhuman, in that it involved torture, depravity of mind or aggravated battery to the victim.

vice Form." Freeman then presented Gray with a form and read each question on the form to him. Gray executed the form, which reads as follows:

SUFFOLK POLICE DIVISION

Legal Rights Advice Form

Date May 22, 1985

1. Do you understand what you may be charged with?
 Armed Robbery
 Yes

2. Do you understand that you have the right to remain silent?
 Yes

3. Do you understand that any statement you make may be used as evidence against you in a court of law?
 Yes

4. Do you understand that you have a right to talk to a lawyer and to have the lawyer present during all questioning, if you so desire?
 Yes

5. Do you understand that if you cannot afford to hire a lawyer, a lawyer will be appointed to represent you and be present during all questioning, if you so desire?
 Yes.

6. The above rights have been fully explained to me, and I sign this paper with complete understanding of them. I further state that I waive these rights and desire to make a statement. I understand that I have the right to stop answering questions at any time.
 Yes

7. This statement is completely free and voluntary on my part without any threats or promises from anyone.
 Yes

Witness /s/ <u>Lt. W. A. Freeman</u> /s/ <u>Coleman W. Gray</u>
 Signature of Person
Witness _____ Being Advised of His
 Rights
Date 5/22/85 Time 9:33 A.M. Date 5/22/85
 Time 9:35 A.M.
<u>Suffolk Det. Bur</u> _____
 Exact Location Exact Location

Freeman testified that after executing the form, Gray, without any questioning by Freeman, became "emotional," and began walking around the room, hitting the wall and exclaiming, "the man wasn't supposed to die." Freeman suggested that Gray "[c]alm . . . down, just sit down [and] [t]ell me what happened."

Without any questioning or interruption by Freeman, Gray proceeded to give him a detailed account of how the offenses had occurred. Gray admitted he had participated in the commission of the crimes with Melvin Tucker, but stated that Tucker actually shot McClelland. Gray told Freeman: "I'm not going to let you write anything. When we get into court it will just be your word against mine." After the interview, Freeman immediately returned to his office and reduced his recollection of Gray's statements to typewritten form.

On the evening of May 22, Gray told Detective Lilley that he wanted to talk with him, saying he would tell "everything." Lilley told Gray that he would talk with him after the arraignment the following day. On the morning of the 23rd, Gray again told Lilley that he wanted to talk with him. Lilley first contacted Gray's court-appointed counsel and arranged for him to interview Gray. When he arrived at the police station, Gray's counsel conducted a lengthy interview with him.

After his attorney left, Gray again "demanded" in the presence of the Suffolk Chief of Police and Detective Bunker that he be allowed to speak with Lilley. Bunker testified at the suppression hearing that Gray asked him what he should do. Bunker asked Gray, "[W]hat did your attorney tell you to do?" Gray said, "My attorney told me to not say anything," to which Bunker responded, "Well, then you should do what your attorney said." Gray, however, said, "No, I want to talk to Sergeant Lilley."

Thereafter, Lilley was contacted and he, Bunker, and Gray went to Lilley's office. Gray executed another rights form containing essentially the same questions and answers as the one he had executed for Freeman the preceding day. Gray then gave Lilley a lengthy and detailed statement in question and answer form. The statement was tape-recorded on a machine that was in full view of Gray at all times, and he saw tapes being changed. When transcribed, the statement consisted of 78 typewritten pages. In his statement to Lilley, Gray again admitted his participation in each of the crimes for which he was charged, but continued to assert that Melvin Tucker was the person who shot McClelland.

Gray contends on appeal, as he did at the suppression hearing, that he would not have made any statements had he known that an unwritten statement could be used against him. He also claims he did not fully understand what his signature on the rights form meant. Additionally, Gray claims that the police made certain statements to him that were coercive or threatening or that contained promises of leniency. The police denied making threats, promises, or coercive statements.

The trial court found that Gray desired to make the statements and did so without promises, inducements, or intimidation. The court also concluded that Gray understood thoroughly his constitutional rights as set forth in *Miranda*.

A defendant's waiver of his *Miranda* rights is valid only if the waiver is made knowingly, voluntarily and intelligently. *Miranda*, 384 U.S. at 475. Whether a statement is voluntary is ultimately a legal rather than factual question. *See Miller* v. *Fenton*, 474 U.S. 104, 110, 106 S. Ct. 445, 450 (1985). Subsidiary factual questions, however, are entitled to a presumption of correctness. *Id.* at 112, 106 S. Ct. at 451. The test to be applied in determining voluntariness is whether the statement is the "product of an essentially free and unconstrained choice by its maker," or whether the maker's will "has been overborne and his capacity for self-determination critically impaired." *Schneckloth* v. *Bustamonte*, 412 U.S. 218, 225 (1973). In determining whether a defendant's will has been overborne, courts look to "the totality of all the surrounding circumstances," *id.* at 226, including the defendant's background and experience and the conduct of the police, *Correll* v. *Commonwealth*, 232 Va. 454, 464, 352 S.E.2d 352, 357 (1987); *Stockton*, 227 Va. at 140, 314 S.E.2d at 381.

Gray was nearly 28 years old at the time of the offense. He possessed a high school equivalency diploma and stated that he could read and write. Gray initiated both conversations with the police. He stated that he understood the legal rights advice form, and his 12-year involvement with police and law enforcement procedures corroborates his statement. In addition to carefully explaining the waiver forms, the police repeatedly told him that they could make no promises or guarantees, and Gray indicated he understood. The police told Gray numerous times that he had a right to have his attorney present, a right to stop answering questions at any time, and that anything he said could be used against him. Gray indicated that he understood and repeatedly told the police that he wanted to talk.

Our review of the record reveals that Gray's right to have counsel present and his privilege against self-incrimination were "scrupulously honored" by the police. *See Michigan* v. *Mosley*, 423 U.S. 96, 103 (1975). From an assessment of the totality of all the surrounding circumstances of the present case, we conclude, as did the trial court, that Gray's statements to the police were made freely, knowingly, and voluntarily and that his *Miranda* rights were not violated.

## C

### Gray's Telephone Statement to Officer Moore.

Gray moved to suppress certain statements that he made over the telephone to Officer Moore, contending that there was an insufficient identification of Gray as the party with whom Moore spoke. The trial court refused to suppress the statements, concluding that the matter was a question for the jury's consideration, and Gray assigned error to this ruling. Because a proper foundation had been laid for the admission of these statements, we find no merit to this contention.

## D

### Searches and Seizures.

Gray contends that the seizure of certain evidence pertaining to McClelland's murder found in his home violated his Fourth

Amendment rights. He also claims that the search of his automobile was illegal.

On May 10, 1985, police officers went to Gray's residence armed with a search warrant that authorized a search of his house for marijuana, paraphernalia, and other drug-related items. During the search, the officers found and seized a quantity of marijuana, cocaine, and drug paraphernalia.

The police also seized other items, unrelated to the drug charge, that connected Gray to the McClelland murder. Among the items seized were a quantity of .32-caliber cartridges, a pistol holster, a jewelry box and jewelry bearing Murphy's Mart price tags, and "gym bags" similar to those reported missing from Murphy's Mart.

Gray does not contest the validity of the search warrant as it related to the drug charge; nor does he question the propriety of the seizure of the drug-related items. Moreover, he concedes that during the conduct of a valid search, the police are entitled to seize evidence of other crimes or contraband without securing an additional warrant. *See Harris* v. *United States*, 331 U.S. 145, 155 (1947). Gray also concedes that given the character of the evidence specified in the warrant, the police were permitted to search the places where evidence of the murder was found. *See Holloman* v. *Commonwealth*, 221 Va. 947, 949, 275 S.E.2d 620, 622 (1981). Gray contends, nonetheless, that the search for drug-related evidence was a sham; he says the true purpose of the search was to look for evidence related to the McClelland murder.

The Attorney General acknowledges that the police knew that Gray was a potential suspect in the McClelland murder when they secured the search warrant and suspected that evidence pertaining to the murder might be discovered during the course of the drug search. The Attorney General contends, however, that seizure of such evidence was proper. We agree.

The validity of the warrant authorizing the search and seizure of drug-related evidence *is not an issue in this appeal.* Drug-related evidence was found and seized, and Gray was arrested for possessing marijuana. The search was not a sham merely because Gray was a possible suspect in the murder case and the police anticipated that during the drug search they might find evidence relating to the murder. *See Horne* v. *Commonwealth*, 230 Va. 512, 517, 339 S.E.2d 186, 190 (1986). The police had a right to be in Gray's residence to conduct a search for

drugs, and in the course of the search, they were entitled to seize evidence of other crimes that was in plain view. *Blair* v. *Commonwealth*, 225 Va. 483, 490, 303 S.E.2d 881, 885-86 (1983).

After searching the residence and arresting Gray on the marijuana charge, the police asked Gray for permission to search his automobile. Gray consented to the search, and the police seized a gasoline can, a siphon hose, and three pairs of gloves from the trunk of the automobile.

Gray does not deny that he gave his consent for the search, but he claims the consent was not voluntary. He asserts that in view of all the circumstances, particularly his arrest and being in handcuffs, his consent was the product of police coercion.

 The burden is on the Commonwealth to prove that a consent is voluntary. *Lowe* v. *Commonwealth*, 218 Va. 670, 678, 239 S.E.2d 112, 117 (1977), *cert. denied*, 435 U.S. 930 (1978); *Hairston* v. *Commonwealth*, 216 Va. 387, 388, 219 S.E.2d 668, 669 (1975), *cert. denied*, 425 U.S. 937 (1976). Whether a consent to a search was voluntary "is a question of fact to be determined from the totality of all the circumstances." *Schneckloth*, 412 U.S. at 227. The mere fact that a defendant is in custody is not enough in itself to demonstrate a coerced consent to search. *United States* v. *Watson*, 423 U.S. 411, 424 (1976); *Lowe*, 218 Va. at 678, 239 S.E.2d at 117.

 The trial court concluded that the consent was voluntary. Nothing in the record suggests that Gray was threatened or intimidated. When asked if they could search his car, Gray said, "Go ahead and search it." The police told Gray he could withdraw his consent at any time, and he never retracted it. Moreover, after he was arrested and taken to the Suffolk police station, he executed a form authorizing the search of his car. From a totality of all the circumstances, we conclude that Gray's consent to search his automobile was given freely and voluntarily.

E

*Identity of Informant.*

In a pretrial hearing, Gray sought, *inter alia*, to discover the identity of the informant relied upon by the police for the issuance of the search warrant. The trial court, after hearing Gray's testimony and the evidence of the police officer who executed the affi-

davit for the warrant, denied the request. The court specifically found that "credible evidence [shows] that there was an informant [and] that the search warrant was . . . valid," and concluded that the informant's identity was privileged.

On appeal, Gray argues that "[t]he failure of the Court to allow [him] to examine the alleged informant, or even to confirm his existence, denied [him] the basic rights of the 5th Amendment's Due Process and the 6th Amendment's right to confront his accusers." The Supreme Court rejected these identical constitutional arguments in *McCray* v. *Illinois*, 386 U.S. 300 (1967).

■ Generally, the identity of a person furnishing the prosecution with information concerning criminal activities is privileged. *See Webb* v. *Commonwealth*, 137 Va. 833, 836, 120 S.E. 155, 156 (1923); Annot. 76 A.L.R.2d 262 (1961 & Supp. 1986). The purpose of the privilege is to further and protect the public's interest in effective law enforcement. *Roviaro* v. *United States*, 353 U.S. 53, 59 (1957). Revealing an informant's identity would discourage private citizens from furnishing the police valuable information; thus, informants demand anonymity to protect themselves and their families. The police often depend upon professional informants for information about crimes. If the public becomes aware of the dual role played by an informant, the informant becomes useless to the police, and persons who might otherwise provide information are discouraged from rendering assistance. *See McCray*, 386 U.S. at 308-09; *Roviaro*, 353 U.S. at 59; *Webb*, 137 Va. at 836, 120 S.E.2d at 156.

Although he concedes the existence of the privilege rule, Gray contends, nevertheless, that the circumstances of the present case warrant an exception. He looks to *Roviaro* as support for his contention. *Roviaro*, however, is inapposite.

■ In *Roviaro*, the informant had been an active participant in the crime. The Court stated that he "had taken a material part in bringing about the possession of certain drugs by the accused, had been present with the accused at the occurrence of the alleged crime, and might be a material witness as to whether the accused knowingly transported the drugs as charged." *Id.* at 55. After reviewing the particular circumstances of Roviaro's trial, the Court noted that the informant was the only participant in the crime other than the accused and therefore his possible testimony was "highly relevant," that he might have "disclosed an entrapment[,] thrown doubt upon [Roviaro's] identity or on the identity of the

package[, or] . . . testified to [Roviaro's] possible lack of knowledge of the contents of the package . . . ." *Id.* at 63-64. The Court concluded that "under these circumstances, the trial court committed prejudicial error in permitting the Government to withhold the identity of its undercover employee." *Id.* at 65.

█ The circumstances of Gray's case are altogether different. Nothing in the record suggests that the informant participated in or knew anything about the crimes for which Gray stands convicted. Unlike *Roviaro*, the informant in the present case could not have been helpful in Gray's defense of his capital murder charge. Indeed, the affidavit for the search warrant shows that the information furnished was limited to Gray's drug activities and the informant was a person who had furnished the police with reliable information of narcotic activities in the past. We conclude, therefore, that under the circumstances of the present case the privilege rule applies and the trial court did not err in its ruling.

F

*Psychiatric Examinations.*

In response to Gray's motion, the trial court appointed a private psychiatrist to evaluate Gray and assist in his defense. Gray contends, nonetheless, that the court erred in refusing to provide him with funds so he could choose his own psychiatrist. The contention is meritless.

█ Before an indigent defendant is entitled to a court-appointed independent psychiatrist to assist the defense in a capital case, there must be a threshold showing that his sanity is likely to be a significant factor in his defense. *Ake* v. *Oklahoma*, 470 U.S. 68, 83 (1985); *Tuggle* v. *Commonwealth*, 230 Va. 99, 104, 334 S.E.2d 838, 841 (1985), *cert. denied*, 478 U.S. ___ , 106 S. Ct. 3309 (1986). Additionally, when the Commonwealth in a capital sentencing proceeding presents psychiatric evidence of an indigent defendant's future dangerousness, the Commonwealth must provide the defendant the assistance of a psychiatrist on the issue. *Ake*, 470 U.S. at 86-87; *Tuggle*, 230 Va. at 107-08, 334 S.E.2d at 843-44. It is clear, however, that an indigent accused does not have "a constitutional right to choose a psychiatrist of his personal liking or to receive funds to hire his own." *Ake*, 470 U.S. at 83; *Pruett* v. *Commonwealth*, 232 Va. 266, 276, 351 S.E.2d 1, 7

(1986); *Beaver* v. *Commonwealth*, 232 Va. 521, 528, 352 S.E.2d 342, 346 (1987); *Tuggle*, 230 Va. at 107, 334 S.E.2d at 843.

■ In the present case, Gray made no threshold showing that his sanity would likely be a significant factor in his defense, and the Commonwealth did not present psychiatric evidence that he would be a danger to society in the future. Nevertheless, the trial court appointed a private psychiatrist to assist the defense. Thus, Gray received more than is constitutionally mandated, and clearly the trial court did not err in refusing to allow Gray to choose his own psychiatrist.

■ After furnishing Gray with the private psychiatrist, the trial court, on the Commonwealth's motion, and over Gray's objection, ordered that Gray be sent to Central State Hospital for a psychiatric examination to determine his mental condition at the time of the offense and whether he might be dangerous in the future. Although Gray complains about the entry of the order, the record shows that he refused to answer all questions posed by the hospital staff. Moreover, no psychiatric evidence was produced at either the guilt phase or the penalty phase of the trial. We conclude, therefore, that Gray's contention that the trial court erred in ordering the examination is without merit.

G

*Refusal of Funds for an Investigator and Statistical Reports.*

■ Gray contends that the trial court erred in denying his request for a publicly paid investigator. The contention is without merit. *See Watkins*, 229 Va. at 478, 331 S.E.2d at 430; *Stockton*, 227 Va. at 140-41, 314 S.E.2d at 382; *Quintana* v. *Commonwealth*, 224 Va. 127, 135, 295 S.E.2d 643, 646 (1982), *cert. denied*, 460 U.S. 1029 (1983); *Martin* v. *Commonwealth*, 221 Va. 436, 445-46, 271 S.E.2d 123, 129-30 (1980). A publicly paid investigator for an indigent defendant is "an act of judicial grace not constitutionally required." *Quintana*, 224 Va. at 135, 295 S.E.2d at 646. For the same reasons, we reject Gray's contention that he is entitled to public funds to secure statistical reports regarding the imposition of the death penalty upon blacks accused of murdering whites.

H

*Commonwealth's Attorney's Election to Prosecute Gray Rather Than Melvin Tucker.*

Both Gray and Melvin Tucker were indicted for capital murder. Afterwards, the Commonwealth's Attorney elected to try only Gray on the charge of capital murder and entered into a plea bargain agreement with Tucker whereby he would be tried on a charge of first-degree murder. Gray contends that to vest a prosecutor with such unbridled discretion renders the imposition of the death sentence upon Gray "cruel and unusual punishment" in violation of the Eighth Amendment to the Federal Constitution.

Ample evidence of motive and means supports the Commonwealth's decision to try only Gray on the capital murder charge. Less than two months prior to the murder, McClelland, manager of a Murphy's Mart store, had fired Gray's wife, Melinda, from her job at the store. The day after McClelland terminated Melinda, Gray visited McClelland at the Murphy's Mart store and discussed her termination with him for about 15 minutes. Eleven days after McClelland discharged Melinda, Gray stole a .32-caliber pistol from a friend's home. The same gun was used to murder McClelland. Gray told one witness several times that he was "going to get" McClelland for firing his wife.

In addition to Tucker's testimony that Gray was the actual perpetrator (the "trigger man") of the capital murder, two witnesses testified that Gray had told them he killed McClelland, and another witness testified that he had overheard Gray admit to someone else that he was the killer. Gray told Melvin Tucker and two of the witnesses that he had to kill McClelland because McClelland knew him and could identify him. On the other hand, Melvin Tucker did not have any personal acquaintance with McClelland prior to the crime.

The institution of criminal charges is a matter of prosecutorial discretion. *Bradshaw* v. *Commonwealth*, 228 Va. 484, 492, 323 S.E.2d 567, 572 (1984). Nothing in the record suggests that the Commonwealth's Attorney acted arbitrarily or abused his prosecutorial discretion. We reject the contention that in exercising his discretion he violated the constitutional proscription against cruel and unusual punishment.

# I

## *Place of Incarceration.*

Gray was tried in the City of Suffolk. Immediately after his arrest for capital murder, Gray was moved from the Suffolk City jail to the Newport News City jail. Several weeks before the trial, Gray was transferred to the Hampton City jail. Both the Newport News and Hampton jails are located within 45 miles of Suffolk. The record shows that security problems, including Gray's own safety, dictated that he not remain in the Suffolk City jail.

Although Gray concedes that his counsel "conferred in person with [him] on a frequent basis," he contends, nonetheless, that placing him in other locations when the Suffolk jail was available denied him effective assistance of counsel and due process in violation of the Federal Constitution. We do not agree.

While Gray's incarceration in other jails was an inconvenience to his counsel, he was not denied access to counsel. Moreover, the court permitted Gray to remain at the Suffolk City jail for several hours on the evenings of the trial so his attorneys could consult with him. Nothing in the record supports his contention that his counsel was ineffective as a result of his incarceration outside of Suffolk.

# J

## *Discovery of Witnesses' Statements.*

In a discovery motion, Gray sought, *inter alia*, the opportunity to inspect and copy statements that Melvin Tucker and the three other witnesses had given to the Commonwealth prior to trial. The trial court ordered that these statements be furnished to Gray "if and when said witnesses testify in this matter and before said testimony is given." Because Gray believed he should be furnished this information a reasonable time prior to trial, he assigns error to the court's ruling.

On appeal, Gray argues that "any inconsistencies between the statements these four individuals gave to the Commonwealth and their subsequent testimony at trial would be of tremendous importance to [his] defense and more importantly, possibly exculpatory." However, Gray has not told us, and the record does not

disclose, how he has been prejudiced by not receiving these state-ments earlier. He alleges no inconsistencies between the state-ments and the witnesses' testimony; nor does he explain how the statements were exculpatory.

 Gray was furnished these statements before the wit-nesses testified, and his counsel vigorously cross-examined the wit-nesses. Because Gray has suffered no harm or prejudice as a result of the court's ruling, we reject his contention.[3]

## II

## JURY MATTERS

### A

### *Change of Venue or Venire.*

Gray claims the trial court erred in refusing to grant a change of venue or, alternatively, a change of venire. He bases his claim on alleged widespread publicity of the crime in the community, but makes no allegation that the publicity was inaccurate or in-temperate. Gray presented no affidavits suggesting widespread community bias and submitted only three newspaper articles. The information in the newspaper articles was factually accurate, non-prejudical, and noninflammatory. In response to extensive ques-tioning by the court and counsel during *voir dire*, each venireman who qualified indicated that his decision would not be affected by anything he had heard or read about the case.

 The decision whether to change venue or venire is a matter within the sound discretion of the trial court, and its ruling will be reversed only upon an affirmative showing on the record that the discretion was abused. *Watkins*, 229 Va. at 481-82, 331 S.E.2d at 432; *Washington v. Commonwealth*, 228 Va. 535, 544, 323 S.E.2d 577, 584 (1984), *cert. denied*, 471 U.S. 1111 (1985); *LeVasseur*, 225 Va. at 577-78, 304 S.E.2d at 651; *Newcomer* v.

---

[3] Similarly, we reject Gray's contention that the trial court erred in refusing to declare a mistrial because the Commonwealth failed to disclose the name of Carl Bond, who was incarcerated with Gray for a period of time. Bond's testimony regarding a conversation with Gray about the McClelland murder contradicted the testimony of another inmate. Because Gray himself discovered Bond's name and whereabouts and called him as a wit-ness at trial, we conclude that Gray suffered no prejudice.

*Commonwealth*, 220 Va. 64, 67, 255 S.E.2d 485, 487 (1979); *Poindexter* v. *Commonwealth*, 218 Va. 314, 319, 237 S.E.2d 139, 142 (1977). Nothing in the record suggests that the trial court abused its discretion in denying a change of venue or venire.

## B

### *Composition of the Jury.*

Forty-three veniremen, of whom 33 were white and 10 were black, were summoned to appear for Gray's trial. The record establishes that the venire panel was properly selected at random. *See* Code §§ 19.2-260, 8.01-343 to -363. Of the 43 veniremen, only 36 prospective jurors underwent a complete, individualized *voir dire.* Of these 36 veniremen, eight were black. Six of the black veniremen were struck for cause by the trial court because each voiced unequivocal objections to the imposition of the death penalty.[4] *See Witherspoon* v. *Illinois*, 391 U.S. 510, *reh'g denied*, 393 U.S. 898 (1968); *LeVasseur*, 225 Va. at 576, 304 S.E.2d at 650; *Coppola* v. *Commonwealth*, 220 Va. 243, 250, 257 S.E.2d 797, 802 (1979), *cert. denied*, 444 U.S. 1103 (1980). On Gray's motion, the court struck for cause venireman Holt, the seventh black, because Holt's father had been the victim of a recent robbery-murder.

After the court had ruled on all challenges for cause and the required number of veniremen had been qualified, only one black, Alknah Thomas, remained. The Commonwealth used its third peremptory strike to remove Thomas.

While recognizing that it is constitutionally permissible for a court to exclude a venireman who voices an absolute objection to the imposition of the death penalty, *see Lockhart* v. *McCree*, 476 U.S. 162 (1986); *Witherspoon*, 391 U.S. at 518, Gray contends that the exclusion of such veniremen in the present case "is a violation of the rights provided to [him] under the 6th [and 14th Amendments] of the U. S. Constitution for an impartial jury" and precluded him from being tried "by a group of his peers." He

---

[4] Gray incorrectly states that "8 out of 10 Negroes or 80%" of the veniremen were struck for cause because they objected to the death penalty. The record clearly shows that only six veniremen were disqualified on this ground. It is not clear from the record that the six veniremen were black. However, because the Commonwealth does not challenge Gray's assertion that the six were black, we assume they were.

contends that because of the views blacks purportedly hold respecting imposition of the death penalty,[5] their exclusion pursuant to *Lockhart* and *Witherspoon* constitutes the use of a "discriminatory criterion." *See Batson* v. *Kentucky*, 476 U.S. 79, ___, 106 S. Ct. 1712, 1717 (1986) (reaffirming the general rule that jury members must be selected in accordance with a non-discriminatory criterion).[6] We find no merit to this contention.

At the outset, we note that a black defendant is not constitutionally entitled to be tried by members of his own race. *Batson*, 476 U.S. at ___, 106 S. Ct. at 1716-17; *Strauder* v. *West Virginia*, 100 U.S. 303, 305 (1880); *Watkins*, 229 Va. at 491-92, 331 S.E.2d at 438. A defendant does have a constitutional right, however, to be tried by jury members selected pursuant to neutral and non-discriminatory guidelines. *See Martin* v. *Texas*, 200 U.S. 316, 321 (1906); *Ex parte Virginia*, 100 U.S. 339 (1880). As Gray concedes, the Supreme Court recently held in *Lockhart* that a death-qualified jury does not violate the right of a defendant in a capital case to be tried by an impartial jury selected from a representative cross-section of the community. 476 U.S. at ___, 106 S.Ct. at 1764. *See also Pruett*, 232 Va. at 277, 351 S.E.2d at 8; *Waye*, 219 Va. at 690-91, 251 S.E.2d at 207.

The *Lockhart* Court stated that "the Constitution presupposes that a jury selected from a fair cross-section of the community is impartial, regardless of the mix of individual viewpoints actually represented on the jury, so long as the jurors can conscientiously and properly carry out their sworn duty to apply the law to the facts of the particular case." *Lockhart*, 476 U.S. at ___, 106 S.Ct. at 1770. In Gray's case, each of the prospective jurors removed for cause stated unequivocally that he or she could not impose the death penalty in any case and, therefore, could not apply the laws of the Commonwealth. The trial court had a duty to remove those veniremen. We conclude, therefore, that the Commonwealth's removal for cause of the six veniremen who voiced absolute objections to imposing the death penalty was accomplished pursuant to a non-discriminatory criterion.

---

[5] Gray presented no empirical data supporting his conclusion that blacks as a group oppose the death penalty.

[6] The ruling in *Batson* applies retroactively to all cases, state or federal, pending on direct review and not yet final. *Griffith* v. *Kentucky*, 479 U.S. ___, 107 S.Ct. 708 (1987).

Gray further contends that he was denied "the opportunity to be tried by a group of his peers" because the Commonwealth used one of its peremptory strikes to remove venireman Thomas. In *Batson*, the Supreme Court held that "the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant." 476 U.S. at ____, 106 S. Ct. at 1719. The Court then concluded that "a defendant may establish a prima facie case of purposeful discrimination in selection of the petit jury solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial." *Id.* at ____, 106 S. Ct. at 1722-23. To establish such a prima facie case the defendant:

[F]irst must show that he is a member of a cognizable racial group . . . and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race. Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits "those to discriminate who are of a mind to discriminate." . . . Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race.

*Id.* at ____, 106 S. Ct. at 1723 (citations omitted).

In the present case, Gray made no timely objection at trial regarding the peremptory striking of Thomas by the Commonwealth's Attorney. Thus, the Commonwealth's Attorney was not afforded an opportunity to explain his reason for the strike, and the trial court had no opportunity to decide whether the reason was constitutionally acceptable. Nevertheless, nothing in the record raises an inference that the Commonwealth's Attorney used his peremptory strike to exclude Thomas from the jury on account of his race. Indeed, it seems apparent from a reading of the following excerpt of Thomas' *voir dire* that it was highly unlikely he would vote for the death penalty under any circumstances.

THE COURT: Could you in a proper case impose the death penalty?

JUROR THOMAS: No.

THE COURT: You could not?

JUROR THOMAS: (Nods head negatively.)

THE COURT: You could not in any way impose the death penalty?

JUROR THOMAS: Yea, I will if I have to.

THE COURT: That's what I said. Could you in a proper case impose the death penalty?

JUROR THOMAS: Yes, yes, yes. If I have to.

THE COURT: Now, we're still talking about a capital murder case. Could you also in a proper case impose the lesser penalty of life imprisonment?

JUROR THOMAS: Yea.

. . . .

[COMMONWEALTH]: Your Honor, I would like to just ask a couple of questions to clarify a couple of things.

Mr. Thomas, you indicated that in a proper case you said that— Could you personally vote to impose the death penalty on somebody that's been convicted of capital murder?

JUROR THOMAS: Can I do that?

[COMMONWEALTH]: Could you vote to give somebody the death penalty in a proper case that's been convicted of capital murder? You, yourself? Could you vote to give a man the death penalty?

JUROR THOMAS: No.

[COMMONWEALTH]: You could not do that?

JUROR THOMAS: If I have to do it I would.

[COMMONWEALTH]: I don't mean if you have to do it. If you had your choice. There are two sentences in this case. He can either be sentenced if convicted of capital murder to life in the penitentiary or to the death penalty.

JUROR THOMAS: I vote for the life.

[COMMONWEALTH]: You would vote for life. Would you vote automatically for a life sentence no matter what the facts?

JUROR THOMAS: No, it's got to be what he did.

[COMMONWEALTH]: Excuse me?

JUROR THOMAS: Depends on what he did.

[COMMONWEALTH]: Depends on what he did?

JUROR THOMAS: That's right.

[COMMONWEALTH]: That's what I'm trying to get straight. You said immediately you would vote for the life imprisonment. If you heard the evidence and determined guilt first and you found the person guilty of capital murder and you then had to decide between voting for the death penalty or voting for life imprisonment could you vote, if the facts justified it, to sentence a man to death or vote for the death penalty? Could you personally vote to do that?

JUROR THOMAS: Yea, I can.

[COMMONWEALTH]: You could? Okay. I have no further questions, Judge.

[DEFENSE COUNSEL]: No questions, Your Honor.

Clearly, Thomas gave an internally contradictory statement concerning his ability to vote for the death penalty. His equivocation was a reasonable, nonracial basis for the Commonwealth's Attorney's strike. Significantly, the Commonwealth's Attorney also peremptorily struck two white jurors who, during *voir dire*, expressed similar uncertainty about imposing the death penalty. We will not infer purposeful discrimination by the peremptory strike of one black, when, as previously noted, the record indicates that there existed a neutral and non-discriminatory basis for the strike.

## C

*Venireman Duplissey.*

Gray assigns error to the trial court's refusal to exclude venireman William Duplissey for cause.[7] Duplissey is a former police officer, having served for 15 years in the County of Nansemond and the City of Suffolk. He later served as a security guard at Newport News Shipbuilding and Drydock Company. His occupation at the time of trial did not involve police or security duties. He last testified in court in 1974. On *voir dire*, he stated that he could render a fair and impartial verdict based on the evidence. A person is not automatically excluded from a jury because of an association with law enforcement personnel, provided he demonstrates that he can be impartial. *Clozza* v. *Commonwealth*, 228 Va. 124, 129, 321 S.E.2d 273, 276 (1984), *cert. de-*

---

[7] Gray's defense counsel subsequently removed Duplissey with a peremptory strike.

*nied*, 469 U.S. 1230 (1985). Whether a venireman should be excluded from a jury is a matter within the sound discretion of the trial court. Because the trial court observes the venireman, its finding is entitled to great weight and will not be disturbed on appeal unless manifest error exists. *Watkins*, 229 Va. at 480, 331 S.E.2d at 431-32; *Calhoun v. Commonwealth*, 226 Va. 256, 258-59, 307 S.E.2d 896, 898 (1983).

Duplissey's answers on *voir dire* support the trial court's finding that, notwithstanding his previous employment in police work, he would be fair and impartial. Thus, we cannot say the court abused its discretion in refusing to strike Duplissey for cause.

## D

### *Alternate Juror Murphy.*

During *voir dire*, the trial court asked a group of veniremen that included George Murphy this question: "Are you or any members of your immediate family employed by any law enforcement agency?" Murphy made no response to the question. Subsequently, Murphy became one of the two alternate jurors.

Prior to the second day of trial, Gray's counsel learned that Murphy's son was currently a member of the Virginia State Police. Gray moved to declare a mistrial, and the trial court denied the motion. Gray assigns error to this ruling.

We reject this contention. Murphy was released from the panel before the case was submitted to the jury. Murphy was merely an alternate and, therefore, did not participate in the jury's deliberations or decision. Because it is clear that Gray has suffered no harm, this issue is without merit.

## E

### *Refusing to Sequester the Jury.*

At the beginning of the trial, Gray moved for the sequestration of the jury, based on the anticipated length of the trial and the publicity it was receiving. The trial court denied the motion. After the jury returned its verdict finding Gray guilty of capital murder, Gray again moved for sequestration of the jury until the penalty phase of the trial commenced the following day. The court also

denied this motion. Although Gray makes no specific allegation that failure to sequester the jury adversely affected the trial, he argues that "as a matter of policy, sequestration of a jury in a capital murder case, especially after a guilty verdict has been returned, should be the norm rather than the exception."

A trial court has broad discretion in deciding whether to sequester a jury. Its discretion extends to capital murder cases. *Boggs,* 229 Va. at 513-14, 331 S.E.2d at 417; *Stockton,* 227 Va. at 138, 314 S.E.2d at 380; *Justus* v. *Commonwealth,* 222 Va. 667, 677, 283 S.E.2d 905, 910-11 (1981), *cert. denied,* 455 U.S. 983 (1982); *Turner* v. *Commonwealth,* 221 Va. 513, 524-25, 273 S.E.2d 36, 43 (1980), *cert. denied,* 451 U.S. 1011 (1981).

In the present case, the trial court admonished the jury twice each day during the five-day trial not to discuss the case with others and to refrain from having any contact with any news media accounts of the trial. Nothing in the record suggests that the jury disregarded the trial court's admonitions. From the record before us, we cannot say the trial court abused its discretion in refusing to sequester the jury.

## III

## THE GUILT TRIAL

### A

*Facts.*

According to established principles of appellate review, we must view the evidence in the light most favorable to the Commonwealth, the prevailing party at trial. As previously indicated, Richard McClelland was the manager of Murphy's Mart store in the City of Portsmouth. He and the store's security guard worked late the evening of May 2, 1985, both having arrived at the store between 9:30 and 10:00 p.m.

On the same evening, approximately 9:30 p.m., Gray and Melvin Tucker, both "high" from "free basing" cocaine, entered the parking lot of Murphy's Mart in Gray's automobile to observe the store. They saw McClelland and the guard inside the store.

Shortly before midnight, McClelland and the security guard left the store in separate automobiles. Gray and Tucker followed

them in Gray's automobile, which Gray was driving. McClelland and the guard went to a fast-food restaurant. McClelland went inside the restaurant, and the security guard went through the "drive-thru" and then left.

When McClelland left the restaurant, he drove toward Smithfield. Gray and Tucker continued to follow him. At a stop sign at the intersection of Nansemond Parkway and Bennett's Pasture Road, Gray pulled his automobile in front of McClelland's car and blocked McClelland's way. Gray, armed with a .32-caliber revolver, directed McClelland to get out of his automobile and into Gray's. Gray struck McClelland, and the two men took McClelland's wallet and threatened to harm his family if he did not cooperate. Gray then drove Tucker and McClelland back to the Murphy's Mart store.

When they arrived at Murphy's Mart, Gray forced McClelland at gunpoint into the store while Tucker waited outside in Gray's automobile. Approximately one-half hour later, Gray and McClelland emerged from the store with a shopping cart containing three gym bags filled with money. Gray, Tucker, and McClelland put the gym bags in the back seat of Gray's automobile and McClelland was told to get back into the car.

Gray then drove to a service station to obtain gasoline. He put some gas in the tank of the car and filled a gas can that was in the car's trunk.

After paying for the gas purchase, Gray drove McClelland and Tucker to the Frederick campus of Tidewater Community College. After passing the college, Gray backed the car down a small side road and ordered McClelland out of the car. Gray then took McClelland to a place approximately 15 to 20 feet behind the automobile and ordered him to lie down on the ground. McClelland obeyed Gray's command.

McClelland begged Gray not to hurt or shoot him, and Gray assured him that he would not be harmed. As McClelland lay face down on the ground, Gray fired six pistol shots in rapid succession into McClelland's head from a distance of 3 to 18 inches. Gray told Tucker as they drove away that he had had to kill McClelland because McClelland knew him.

Gray and Tucker then drove to the intersection where they had left McClelland's car. Gray told Tucker that he was going to burn McClelland's car to destroy evidence. Gray took the can of gasoline from the trunk of his car and doused the interior of McClel-

land's automobile with gasoline. He lit a match, threw it into Mc-Clelland's car, and closed the door. Gray and Tucker subsequently returned to Gray's apartment to count the stolen money, which amounted to between $12,000 and $13,000.

Some days later, Tucker and Gray went to the Nansemond Treatment Plant where Tucker was employed, and Gray threw the revolver into a contact tank. The police later recovered the revolver after Gray showed them its location.

The police discovered McClelland's body at the scene of the crime on the morning of May 3 just a few hours after he had been shot. An autopsy performed later that day established that Mc-Clelland had received six close-range .32-caliber gunshot wounds to the head, any one of which could have caused his death.

## B

### Photographs Depicting Victim's Body and Wounds.

The trial court, over Gray's objections, admitted into evidence six color photographs of the victim's body, including five of his bloody head. Three photographs depicted the victim's body as found at the scene of the crime; the remaining three photographs were taken at the autopsy. Gray contends the court erred in admitting these photographs because they "served no purpose other than to inflame the jury." We disagree.

The admission of photographs is a matter resting within the sound discretion of a trial court. *Wise* v. *Commonwealth*, 230 Va. 322, 330, 337 S.E.2d 715, 720 (1985), *cert. denied*, 475 U.S. 1112 (1986); *Watkins*, 229 Va. at 482, 331 S.E.2d at 433; *Poyner* v. *Commonwealth*, 229 Va. 401, 417, 329 S.E.2d 815, 827, *cert. denied*, 474 U.S. 888, 474 U.S. 865 (1985); *Washington*, 228 Va. at 551, 323 S.E.2d at 588; *Jones* v. *Commonwealth*, 228 Va. 427, 450, 323 S.E.2d 554, 566-67 (1984); *Coleman* v. *Commonwealth*, 226 Va. 31, 48, 307 S.E.2d 864, 873 (1983), *cert. denied*, 465 U.S. 1109 (1984); *Bunch*, 225 Va. at 436-37, 304 S.E.2d at 278; *Peterson* v. *Commonwealth*, 225 Va. 289, 294, 302 S.E.2d 520, 524, *cert. denied*, 464 U.S. 865 (1983); *Clanton* v. *Commonwealth*, 223 Va. 41, 51, 286 S.E.2d 172, 177 (1982); *Martin*, 221 Va. at 447, 271 S.E.2d at 130; *Stamper*, 220 Va. at 270, 257 S.E.2d at 816. Photographs of a victim are relevant if they tend to show motive, intent, method, premeditation, malice, or the degree

of atrociousness of the crime. *Stockton*, 227 Va. at 144, 314 S.E.2d at 384; *Waye*, 219 Va. at 692, 251 S.E.2d at 208; *Smith*, 219 Va. at 467, 248 S.E.2d at 143. Photographs that accurately portray a scene created by an accused in the commission of an offense are not rendered inadmissible because they are gruesome or shocking. *Washington*, 228 Va. at 551-52, 323 S.E.2d at 588.

■ In the present case, the photographs of the victim, though gruesome, accurately portrayed what the defendant had created and were relevant to establish intent, malice, premeditation, and atrociousness of the crime. We note, moreover, that the trial court rejected two photographs offered by the Commonwealth because they were duplicative of other photographs that were admitted. We hold that the trial court did not abuse its discretion in admitting the six photographs into evidence.

### C

*Admissibility of the Autopsy Report.*

Gray contends that because the pathologist who performed the autopsy on the victim testified at trial, the admission of the autopsy report constituted error. He argues that the report has "no probative value and only tends to inflame the jury." We do not agree.

■ We have previously rejected this identical contention. *See Fitzgerald v. Commonwealth*, 223 Va. 615, 630, 292 S.E.2d 798, 806-07 (1982), *cert. denied*, 459 U.S. 1228 (1983). Moreover, Code § 19.2-188 authorizes the admission of the report.

### D

*Requirement that Gray be in Leg Irons.*

■ Gray contends that the trial court erred in requiring him to remain in leg irons during his trial. The court concluded that the restraints should be imposed because of the serious nature of the charges against him and to maintain security. The court, however, took pains to ensure that the jury remained unaware that Gray was shackled. Moreover, when Gray took the witness stand

to testify during the sentencing phase, the leg irons had been removed outside the jury's view.

The conduct of a trial is left to the sound discretion of a trial court. *Watkins*, 229 Va. at 484, 331 S.E.2d at 433; *Justus*, 222 Va. at 676, 283 S.E.2d at 910. Requiring leg irons is a proper exercise of a court's discretion, and the court's decision need not be made upon a formal evidentiary hearing. *Frye v. Commonwealth*, 231 Va. 370, 381-82, 345 S.E.2d 267, 276 (1986).

In the present case, the trial court's ruling was reinforced by Gray's extensive and violent criminal history and the gravity of the offense for which he was being tried. Thus, we conclude that the trial court did not abuse its discretion in requiring that Gray remain in leg irons during the trial.

E

*Sufficiency of the Evidence of Capital Murder.*

Gray claims the evidence is insufficient to support his conviction of capital murder because the testimony of Melvin Tucker, the co-defendant, and the three other prison inmates who testified that Gray admitted killing McClelland is incredible. We do not agree.

It is a jury's function to judge the credibility of the witnesses and the weight of their evidence. The jury has the opportunity to observe the witnesses' demeanor while testifying, to consider their interest in the outcome of the case, and to determine from all the circumstances of the case which witnesses are more believable. *See Johnson v. Commonwealth*, 224 Va. 525, 528, 298 S.E.2d 99, 101 (1982); *Coppola*, 220 Va. at 252, 257 S.E.2d at 803.

The trial judge, who also observed the witnesses and considered the evidence, has approved the jury's verdict. A trial court's judgment approving a jury's verdict is entitled to great weight on appeal and will not be disturbed unless it is contrary to law or plainly wrong. Code § 8.01-680; *Stockton*, 227 Va. at 145-46, 314 S.E.2d at 385.

The Commonwealth relied in large measure upon the testimony of Tucker and the other three prison inmates to establish that Gray actually perpetrated McClelland's murder. Although Gray has attacked their veracity, the jury was in the best position to

assess their credibility. Moreover, from other circumstances proved, the jury reasonably could infer that Gray was the "trigger man." The murder weapon had been stolen by Gray. Gray, not Tucker, was acquainted with McClelland. Because McClelland had fired Gray's wife from her job at Murphy's Mart, Gray had a motive to kill McClelland. Indeed, he told a friend that he was "going to get" McClelland. The jury and the trial court were convinced beyond a reasonable doubt that Gray was the perpetrator of the murder.

We cannot say that the judgment is plainly wrong or that the evidence that Gray was the "trigger man" is incredible as a matter of law. Accordingly, we conclude that the Commonwealth successfully proved "beyond a reasonable doubt that motive, time, place, means and conduct concur in pointing out the accused as the perpetrator of the crime." *Quintana*, 224 Va. at 143, 295 S.E.2d at 651 (citation omitted).

## IV

## THE PENALTY TRIAL

### A

### *The Sorrell Murders.*

During the penalty phase of the trial, Melvin Tucker testified that Gray told him he had "knocked off" Lisa Sorrell. According to Tucker, Gray made the statement as he pointed to a picture of Lisa Sorrell in a newspaper while searching for news articles concerning McClelland's murder.

Over Gray's objection, the court permitted the Commonwealth to present additional evidence showing that two Sorrell murders actually had occurred. The police officer who had investigated the murders testified that he found the body of Lisa Sorrell slumped in the front passenger seat of a partially burned automobile in Chesapeake, a city that shares borders with Suffolk. In the trunk of the automobile was the body of Lisa's three-year-old child, Shanta Sorrell. The officer identified various photographs of the automobile and the victims. The photographs were admitted into evidence.

A State medical examiner who had performed autopsies on the bodies of Lisa and Shanta Sorrell testified about the causes of their deaths. He opined that Lisa was killed by six gunshot wounds to the head, apparently inflicted by a .32-caliber firearm, and that Shanta died of carbon monoxide inhalation. Gray, testifying in the penalty phase, denied any involvement in the Sorrell murders.

Gray contends on appeal that the trial court erred in admitting evidence of the Sorrell murders. He argues that the evidence was "highly inflammatory and inherently prejudicial." Gray points out that at the time of the trial he had not even been charged with the commission of these crimes. Gray says the only evidence linking him to these murders was the testimony of Melvin Tucker, the co-defendant with whom the Commonwealth had reached a plea bargain agreement.

In the penalty phase of a bifurcated capital murder trial, "it [is] desirable for the jury to have as much information before it as possible when it makes the sentencing decision." *Gregg v. Georgia*, 428 U.S. 153, 204 (1976). Consistent with *Gregg*, Code § 19.2-264.4(B) provides that the jury may consider evidence that includes "the history and background of the defendant." Indeed, "[t]he jury has the duty to consider all the evidence relevant to sentencing, both favorable and unfavorable" before determining whether it is probable that the defendant would commit future acts of violence that would constitute a continuing, serious threat to society. *Stamper*, 220 Va. at 275-76, 257 S.E.2d at 819. "[E]vidence of prior unadjudicated criminal conduct . . . may be used in the penalty phase to prove the defendant's propensity to commit criminal acts of violence in the future." *Watkins*, 229 Va. at 488, 331 S.E.2d at 436. *See Quintana*, 224 Va. at 147-48, 295 S.E.2d at 654. Determining the credibility of witnesses is peculiarly within the province of the jury.[8] *Johnson*,

---

[8] Although he made no objection to Tucker's testimony at trial, Gray now relies on *Lee v. Illinois*, 476 U.S. 530 (1986), to press the argument that Tucker's testimony was "presumptively unreliable" and should not have been introduced because there were insufficient indicia of reliability to rebut the presumption. *Lee* involved the introduction of a co-defendant's out-of-court written confession incriminating the accused in a double-murder case. The co-defendant did not testify and, thus, was not subject to cross-examination. The Supreme Court held that the inability to cross-examine the co-defendant violated the accused's Sixth Amendment right to confront witnesses. *Id.* at ___, 106 S.Ct. at 2063.

224 Va. at 528, 298 S.E.2d at 101; *Coppola*, 220 Va. at 252, 257 S.E.2d at 803.

Gray was connected to the Sorrell murders by the testimony of Melvin Tucker. The jury heard and observed both Tucker and Gray and apparently chose to believe Tucker. We cannot say Tucker's testimony was incredible as a matter of law.

Moreover, the evidence of the police officer and the medical examiner indicated that the Sorrell murders were accomplished in a manner strikingly similar to the execution style of the McClelland murder. Lisa Sorrell also was shot six times in the head, and her automobile, like McClelland's, was burned after the murder. Thus, the officer's and doctor's evidence tended to corroborate Tucker's testimony of Gray's admission.

Gray's admission and the information about the particulars of the Sorrell murders were relevant evidence of Gray's propensity to commit violent acts in the future. We conclude, therefore, that the trial court did not err in admitting this evidence.

### B

*Criminal Record, History, and Background.*

Gray, 28 years old at the time of his trial, has a criminal record dating to 1973. In August 1973, while a juvenile, he was found not innocent of petit larceny and ordered to complete one year of supervised probation. In January 1976, as an adult, Gray was convicted of burglary in Los Angeles, California. For this conviction, he served four days in jail and was placed on probation for one year.

In March 1977, Gray was convicted of disturbing the peace and resisting arrest in the City of Portsmouth, for which he was fined $10.00 and sentenced to five days in jail. The jail sentence was suspended on the condition that he be of good behavior for 12 months.

In May 1978, also in the City of Portsmouth, Gray was found guilty of malicious wounding, attempted robbery, and use of a firearm. He was sentenced to a total of 21 years in prison. In August 1983, he was released on parole. Gray was on parole at the

---

In the present case, however, Gray had the opportunity to cross-examine Tucker, and the jury had the opportunity to assess Tucker's credibility and reliability. We conclude, therefore, that *Lee* has no application to the facts of this case.

time he committed the offenses involved in these appeals. He also has been convicted of possession of marijuana with intent to distribute and possession of cocaine.

From November 1983 to May 1984, while on parole, Gray worked at Morrison's Cafeteria. William Palmer, general manager of the cafeteria, testified that Gray's employment was terminated because of his use of profanity. Palmer stated that Gray had a "bad attitude." Thaddeus Eley, a chef at the cafeteria, testified that Gray had told him that he "could kill" Palmer for firing him.

Ronald Whitte testified that in July 1977, while he, his wife, and two small children were bicycling, Gray and another man accosted them. Gray displayed a pistol, ordered Whitte to halt, threatened to kill Whitte, and demanded money from him. When Whitte refused to comply, Gray fired several shots from the pistol, wounding Whitte in the arm and foot.

Lawrence Tucker, who is Melvin Tucker's brother and a convicted felon, testified that, in May 1985, he had overheard Gray recount to Melvin the details of Gray's robbery of the Circle Seafood Restaurant. Gray related the incident to relieve Melvin Tucker's concerns about the Murphy's Mart robbery. Lawrence Tucker stated, "[H]e told Melvin don't worry about it, because he got away with something like that and he can get away with this."

Melvin Tucker testified that Gray told him "he had took the Circle Restaurant off" and showed Tucker the money taken in the robbery. Melvin Tucker also testified that, within a week after the Murphy's Mart robbery, he and Gray heard a rumor that a young woman had been talking about the incident. When they saw the woman on the street, Gray told Tucker that if "she keep on running her mouth [I'm] going to fuck her up."

Sylvester Joyner and Gray were both incarcerated in the same cell block in the Suffolk City jail. Joyner testified that Gray told him that he had to leave California because "he had killed a guy out there." The jury also heard evidence pertaining to the Sorrell murders, which has been discussed in the preceding section.

Gray called seven witnesses who gave mitigating testimony. Gray, himself, also testified in the penalty phase.

Catrina Hargrove had been a neighbor of Gray for several months preceding his arrest. She had frequent contact with Gray and his wife. She described Gray as a "very nice person" and stated that she had never seen Gray exhibit any anger or hostility

toward her or anybody. Hargrove had observed Gray playing with her four-year-old daughter. Hargrove said she was shocked and surprised to learn of Gray's involvement in the murder.

Keith Silver also was a friend and former neighbor of Gray. He had known Gray for approximately four years and for about one year they lived across the hall from each other. He testified that Gray treated Silver's wife and daughter as if they were "family." Silver said he did not believe that Gray was capable of murdering McClelland because such conduct was totally out of character for Gray.

Kelvin Penny, a friend and former co-worker with Gray at Morrison's Cafeteria, testified that Gray was "great," a "good guy." He also believed that the murder was out of character with his friend.

David Wilson, a contractor for brick work and former employer of Gray, described Gray as a "[v]ery good worker." He stated that Gray got along well with everyone, never threatened anyone, and never got into fights. He also said that the murder was out of character with Gray.

Terry Carter, a probation and parole officer in the City of Portsmouth, testified that Gray had been under his supervision from August 1983 to January 1985. He stated that Gray was punctual in keeping appointments and respectful to him. He never observed any hostility in Gray.

Mavis Spitzer, who had been Gray's probation officer since January 1985, testified that Gray was "always very polite, very well-mannered, very cooperative." She also stated that on her unannounced visits she found his home "always very neat and clean, very tidy."

Rafiq Zaidi, who described himself as a Muslim minister, testified that in January 1985 Gray had been generous in contributing funds to a needy woman and her children. The minister said that the acts involved in the murder were "[t]otally inconsistent" with Gray.

Bishop Maurice Johnson, an elderly retired minister, was well acquainted with Gray. Johnson's wife is related to Gray, and Johnson performed the marriage ceremony for Gray and his wife. Bishop Johnson described Gray as an outgoing person who never exhibited hostility to him or to anyone else.

Gray testified that he was not the "trigger man." He denied any involvement in the Sorrell murders and stated that he had been

acquitted of the murder charge in California. Conceding that the part he played in the McClelland murder was wrong, he reiterated that he did not pull the trigger.

## C

### *Jury Instructions.*

Gray contends that the trial court erred in refusing four jury instructions he proffered at the penalty phase of the trial. They were identified as Instructions 4A, 4B, 4C, and 4D.

Instruction 4A would have told the jury that it was not required to impose the death penalty even though it believed beyond a reasonable doubt that one or both of the aggravating factors necessary to support a death penalty had been proved. The court did instruct the jury, however, as follows:

> You have convicted the defendant, Coleman Wayne Gray, of capital murder which may be punished by death. You must decide whether the defendant shall be sentenced to death or life imprisonment. Before the penalty can be fixed at death, the Commonwealth must prove beyond a reasonable doubt at least one of the following two alternatives:
>
> > (1) That, after consideration of his history and background, there is a probability that he would commit criminal acts of violence that would constitute a continuing serious threat to society; or
> >
> > (2) That his conduct in committing the offense was outrageously or wantonly vile, horrible or inhuman, in that it involved torture, depravity of mind or aggravated battery to the victim beyond the minimum necessary to accomplish the act of murder.
>
> If you find from the evidence that the Commonwealth has proven beyond a reasonable doubt either of the two alternatives, then you may fix the punishment of the defendant at death *or if you believe from all the evidence that the death penalty is not justified, then you shall fix the punishment of the defendant at life imprisonment.*

If the Commonwealth has failed to prove either alternative beyond a reasonable doubt, then you shall fix the punishment of the defendant at life imprisonment.

(Emphasis added.)

■ The above-quoted instruction sufficiently and properly states the statutory framework. *LeVasseur*, 225 Va. at 594-95, 304 S.E.2d at 661. Refused Instruction 4A would have been repetitious of the language that we have emphasized in the granted instruction. "When granted instructions fully and fairly cover a principle of law, a trial court does not abuse its discretion in refusing another instruction relating to the same legal principle." *Stockton*, 227 Va. at 145, 314 S.E.2d at 384.

Instruction 4B would have told the jury that life imprisonment must be imposed if the jury had a reasonable doubt as to "any fact or conclusion which is required before the death penalty can be imposed." This instruction also is repetitious. The last two paragraphs of the granted instruction fully cover the principle of law involved.

■ The trial court properly refused Instruction 4C, which listed specific mitigating factors that the jury could consider and would have told the jury that their decision upon the mitigating factors need not be unanimous. Indeed, failure to list mitigating factors inures to the benefit of a defendant. Whereas aggravating factors are limited and must be listed, "a jury is not so limited in considering mitigating factors, but may consider any and all [such] factors." *Clark* v. *Commonwealth*, 220 Va. 201, 212, 257 S.E.2d 784, 791 (1979), *cert. denied*, 444 U.S. 1049 (1980). Moreover, informing the jury that its decision on mitigating factors need not be unanimous could create confusion in the jurors' minds because they are instructed that unanimity is required to impose the death penalty. *See* Code § 19.2-264.4(E).

■ Instruction 4D would have told the jury that it "must assume that the Defendant will be executed" if it imposed the death penalty. We assume that Gray requested this instruction to evoke the jury's sympathy. The instruction, a comment upon the obvious, was redundant, and the court properly refused it.

V

## SENTENCE REVIEW

■ Code § 17-110.1(C) mandates that we review the death sentence. In so doing, we are required to consider and determine whether the death sentence "was imposed under the influence of passion, prejudice or any other arbitrary factor," and whether the sentence "is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." *Id.*

Contending that the sentence of death was the product of passion, prejudice, or other arbitrary factors, Gray again raises the issue of the court's failure to immediately exclude alternate juror Murphy who had "close family ties to . . . law enforcement." Gray suggests that the trial court "permitted [Murphy] to communicate his opinion to the other jury members throughout the several days leading up to [Gray's] conviction."

Elsewhere in this opinion, we have considered and rejected Gray's contention respecting Murphy. We reiterate, however, that Murphy was merely an *alternate* juror. He did not participate in the deliberations and decisions of the jury. Moreover, there is absolutely nothing in the record to suggest that Murphy "communicate[d] his opinion to the other jury members."

Gray again raises the argument that the photographs of the victim were inflammatory, and we will stand on what we have previously said concerning this issue. We also have addressed Gray's final argument: that the court erred in admitting evidence of the Sorrell murders in the penalty trial. For reasons previously stated, we again reject this contention.

Gray also argues that in our review of the sentence we "should consider the cumulative effect of the errors of the trial court." Because we have found no error in the conduct of either the guilt or penalty trial, we reject Gray's cumulative-effect argument. *See Wise*, 230 Va. at 335, 337 S.E.2d at 723; *Boggs*, 229 Va. at 522, 331 S.E.2d at 422; *Waye*, 219 Va. at 704, 251 S.E.2d at 214.

■ By its verdict, the jury found that both the "dangerousness" and "vileness" predicates had been proved beyond a reasonable doubt. Gray contends that the evidence does not rise to the level necessary for the imposition of the death sentence based upon either predicate. We do not agree.

Respecting "dangerousness," we look first to Gray's lengthy criminal record. It is significant that in July 1977, during the period in which he was under a one-year suspended jail sentence, Gray participated in the crimes against Ronald Whitte that led to his convictions of malicious wounding, attempted robbery, and use of a firearm. More significantly, however, is Gray's participation in all of the present violent crimes against McClelland while Gray was on parole for the Whitte offenses. His record establishes that from 1976 to 1985 Gray committed 13 felonies, at least nine of which were crimes of violence. This is shocking, especially when we take into account that during this nine-year period Gray was confined in prison for more than five of those years. His record clearly demonstrates a trend towards increasingly violent crimes.

We also look to the testimony relating to Gray's history and background. From this, we learn that he told others he had committed a robbery at the Circle Seafood Restaurant in May 1985 and had locked the restaurant employees in a food freezer. He told another he murdered the Sorrells in 1984. He has threatened the lives of two persons other than McClelland.

We have considered the circumstances surrounding Mc-Clelland's murder, especially Gray's arming himself and engaging in a planned enterprise. Additionally, we have reviewed the evidence presented in mitigation. After considering all aggravating and mitigating factors, we conclude that the evidence supports the jury's finding that Gray posed a continuing, serious threat to society.

We turn next to the "vileness" predicate. From the time Mc-Clelland fired Gray's wife, Gray planned revenge. He stole the gun that he later used in McClelland's murder. He had his wife sketch the layout of Murphy's Mart. He solicited Melvin Tucker to assist him with the robbery.

On the night of the murder, Gray and Tucker waited about three hours for McClelland to come out of the store and followed him until he reached a deserted intersection. Gray ordered Mc-Clelland out of the car at gunpoint, striking him in the face with his hand.

Throughout the ordeal, Gray threatened to harm McClelland's family. Indeed, before entering Murphy's Mart, Gray told Mc-Clelland that Tucker would stay outside in the car to "take care" of McClelland's family if he were uncooperative. McClelland never resisted and was totally cooperative.

Gray originally wanted to push McClelland into a contact tank at the treatment plant. However, Tucker would not use his employee status to escort Gray through the plant's entrance gate. Consequently, Gray took McClelland to a remote area by Tidewater Community College and had him lie face down on the ground. Without any provocation whatsoever, Gray fired six bullets into McClelland's head. In retelling the story of McClelland's murder to an inmate, Gray "laugh[ed] about the fact that he shot and killed the guy, as if it was nothing to him." Gray's laughter and total lack of remorse prompted the inmate to inform the police of Gray's confession.

From our review, we believe the evidence is sufficient to support the jury's finding of "vileness" beyond a reasonable doubt. Indeed, Gray's overall conduct in committing McClelland's murder was outrageously vile and inhuman, in that it involved depravity of mind and aggravated battery to the victim.

Pursuant to Code § 17-110.1(E), we have accumulated and considered the records of all capital murder cases reviewed by this Court to determine whether "juries in this jurisdiction generally approve the supreme penalty for comparable or similar crimes." *Stamper*, 220 Va. at 284, 257 S.E.2d at 824. From this review, we conclude that Gray's sentence was not excessive or disproportionate to sentences generally imposed by other sentencing bodies in Virginia for crimes similar in nature.

## VI

## CONCLUSION

We have considered all 41 of Gray's assignments of error and find no reversible error in any of them. Accordingly, the judgments of the trial court will be affirmed.

*Record No. 860373 - Affirmed.*
*Record No. 860374 - Affirmed.*