COURT OF APPEALS OF VIRGINIA

Present:  Chief Judge Moon, Judges Benton and Elder
Argued at Richmond, Virginia


JONATHAN ROMEO CRUMP
                                        OPINION BY
v.  Record No. 0570-94-2        JUDGE JAMES W. BENTON, JR.
                                        AUGUST 8, 1995
COMMONWEALTH OF VIRGINIA


        FROM THE CIRCUIT COURT OF LUNENBURG COUNTY
                 William L. Wellons, Judge

        Buddy A. Ward, Public Defender (Robert H.
        Morrison, Assistant Public Defender, on brief),
        for appellant.

        Marla Lynn Graff, Assistant Attorney General
        (James S. Gilmore, III, Attorney General, on
        brief), for appellee.


        Jonathan Romeo Crump was convicted for the rape of a child

under the age of thirteen in violation of Code § 18.2-61.  He

contends on this appeal that (1) the child's refusal to respond

to questions from his counsel was a denial of his Sixth Amendment

right to cross-examine the child, and (2) the evidence was

insufficient to prove his guilt beyond a reasonable doubt.  For

the reasons that follow, we affirm his conviction.

                                I.

        The evidence proved that Crump lived with the child's mother

in the same residence with the child and two of the child's

siblings, one of whom was Crump's child.  The child, who was

eight years old at the time of the trial, testified that when she

returned home from school on May 13, 1993, only Crump was at

home.  The child testified that Crump entered her bedroom, pulled

down her underwear, and made her bend over a chair. He then pushed his "private part" into her "private part." She testified that it hurt her and that she felt "[w]et stuff" on her after Crump stopped. Crump went into the bathroom and later left the home. The child testified that she did her homework and waited for her mother. When her mother came home, the child told her what had happened. The child also testified that the next day Crump took her into the bathroom and told her to "[t]ell . . . that my uncle did it . . . . [b]ehind the house."

On cross-examination, the child again testified that Crump entered her bedroom, "pulled [her] pants down," and "told [her] to bend over." When Crump's trial counsel asked what happened after this, the child did not answer his question. In response to further questioning, the child answered that she felt "[w]et stuff running down my leg" and said that Crump then "stopped and went to the bathroom."

When the child would not elaborate upon "exactly what happened after [she] bent over," Crump's trial counsel objected to the child's unresponsiveness and moved that her direct testimony be stricken. The trial judge denied the motion. On recross-examination, the child testified in response to defense counsel's further questioning that Crump "put his private part on [her] private part," and she "felt wet stuff coming down [her] legs."

The mother testified that when she returned home on May 13

the child told her that Crump "child molested" her.  The mother bathed the child and noticed that her genitalia was "red."  She also observed that the child had "white stuff" in her genital area and on her clothes.  The mother testified that she angrily confronted Crump and began hitting him.  Crump said nothing, slammed the door as he left, and went to his mother's house.  When Crump returned the next day, the mother testified that she again confronted him.  The mother also testified that she saw Crump and the child in the bathroom and heard him tell the child to say that the child's uncle did it.

The evidence also proved that when the child first spoke to police about the incident, she reported that her uncle had raped her.  The child's uncle was arrested and charged with rape.  After investigation, the uncle was released and Crump was arrested.  The mother testified that she did not inform the police of Crump's actions until two months after the child's complaint because she was afraid of Crump and believed he would kill her if she informed the police.

## II.

The Confrontation Clause in the Sixth Amendment to the Constitution of the United States guarantees an accused the right to cross-examine witnesses in criminal proceedings.  Pointer v. Texas, 380 U.S. 400, 403-04 (1965).  Article I, Section 8 of the Constitution of Virginia also guarantees this right.  Moore v. Commonwealth, 202 Va. 667, 669, 119 S.E.2d 324, 327 (1961).

- 3 -

Relying upon the decisions of the Supreme Court, this Court has stated that, "'[g]enerally speaking, the Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'"  Nichols v. Commonwealth, 6 Va. App. 426, 429, 369 S.E.2d 218, 220 (1988) (quoting Delaware v. Fensterer, 474 U.S. 15, 20 (1985)).

> The Confrontation Clause includes no guarantee that every witness called by the prosecution will refrain from giving testimony that is marred by forgetfulness, confusion, or evasion.  To the contrary, the Confrontation Clause is generally satisfied when the defense is given a full and fair opportunity to probe and expose these infirmities through cross-examination, thereby calling to the attention of the factfinder the reasons for giving scant weight to the witness' testimony.

Fensterer, 474 U.S. at 21-22.

On appeal, Crump's counsel concedes that Crump's trial counsel was given the opportunity to cross-examine the child. Crump contends that his right to confront the child in cross-examination was denied, however, "because his efforts to address material issues introduced in direct examination were thwarted by the [child's] refusal to answer questions put to her during cross-examination."

The transcript of the child's testimony reveals that throughout direct and cross examinations the child frequently moved her head in response to questioning.  Neither the prosecutor nor defense counsel sought a verbal response on the

- 4 -

many occasions when, as the transcript indicates, the child "nods head in affirmative" or "shakes head in negative."  For example, the child testified on cross-examination as follows:

Q  Okay.  Well, now, tell me the truth about what happened.  Who was it that touched your privates?

A  Jonathan [Crump].

Q  Okay.  Who told you to say that?

A  Nobody.

Q  Nobody told you to say it was Jonathan [Crump]?  Nobody told you to say it was Jonathan [Crump]?

A  No.

      *    *    *    *    *    *    *

Q  Now, when did you tell somebody that Jonathan [Crump] did it?  Okay, the day this happened, okay, let's go back to that for a minute.  Who did you tell?  Did you tell anybody the day it happened?

A  (Witness nods head in affirmative.)

Q  Who did you tell?

A  My mama.

Q  Okay, and what did she do?

A  Wait until the next day.

Q  She waited until the next day and then what did she do?  Did she call the police?

A  (Witness shakes head in negative.)

Q  How long was it before [your mother] called the police?

A  She didn't call them.

Q  She didn't call the police, okay.  Did you

tell her that Uncle Willie did this?

A  (Witness shakes head in negative.)

Q  You told her Jonathan [Crump] did it?

A  (Witness nods head in affirmative.)

Q  Why did you do that?

A  Because he did it.

Although trial counsel may not have elicited the answers that he was seeking, the transcript reflects that the child was thoroughly cross-examined and substantially responded to trial counsel's questions.  Crump's claim of deprivation relies in large measure upon the child's initial failure to respond to his trial counsel's attempt to have her repeat the testimony she gave on direct examination concerning the actual penetration.  In particular, she balked when questioned as follows:

Q  Come on, you can do it.  What happened after he asked you to bend over, told you to bend over?  Do you remember what happened?

A  (Witness nods head in affirmative.)

Q  Well, then, spit it out and tell us.  Come on, . . . we're almost done.  Just tell us what happened.  I need to hear it from you, you can tell me what happened?

. . . you were doing good there for a while.  Like I said, we're almost done here. Just tell me what happened at that point after he told you to bend over.

Okay, I'll come back to it in a minute. Let me go to the day when Jonathan [Crump] hit you, okay.  Do you remember that one clearly?

A  (Witness nods head in affirmative.)

Q   You're sure?

A   (Witness nods head in affirmative.)

             *    *    *    *    *    *    *

Q   Okay.  Now, back to your favorite subject again, back to the day after school when he came in your bedroom and he told you to bend over.  Tell me what happened after that?

     Are you going to answer me?  If I stay here until darkness falls and you all get hungry, are you going to answer me?

THE JUDGE:  . . . , you understand what Mr. Morrison is asking you, so tell us what happened after he told you to bend over.  Do you understand?

A   (Nods head in the affirmative.)

THE JUDGE:  Do you know what happened after he told you to do that?  Do you know what happened.  You do, don't you?

A   (Nods head in the affirmative.)

             *    *    *    *    *    *    *

THE JUDGE:  You couldn't see him.  What did you feel?

A   Wet stuff running down my leg.

THE JUDGE:  Proceed . . . .

Q   Can you tell me?  You must like the Judge a lot better than me.  Can you tell me what happened?  Now, you say after you bent over, then a little while later you felt wet stuff.

A   (Witness nods head in affirmative.)

Q   Now, start from when he had you bend over and tell me what happened through the wet stuff and afterwards.

A   He stopped and went to the bathroom.

Q   I didn't catch that, say it again.

        A   He stopped and went in the bathroom.

        Q   That was afterwards?

        A   (Witness nods head in affirmative.)

        Q   What happened before then?

When the child failed to respond to the last question, trial counsel moved to strike her testimony.

We conclude that the trial judge did not err in refusing to strike the testimony. When the child failed to respond, she had been extensively and repetitively questioned by two lawyers and the judge. She was only eight years of age. "[W]here a witness refuses to answer only one or a few questions on cross-examination, the right to confrontation is not necessarily violated." Nichols, 6 Va. App. at 430, 369 S.E.2d at 220. Moreover, although the transcript obviously does not reflect the tone in which questions were asked, the transcript does suggest that the child was being questioned in a manner that did not reflect a sensitivity for her age. Her responsiveness could not have been enhanced by being told to "spit it out," to go "back to your favorite subject again," or "you must like the judge a lot better than me."

Furthermore, the child made the following responses on re-cross-examination by Crump's trial counsel:

        Q   When Jonathan [Crump] told you to bend
        over, you remember that part, right, you told
        us about that earlier, what happened right
        after that?

        A   He put his private part on my private

part.

Q  He put his private part on your private part?

A  (Witness nods head in affirmative.)

Q  Okay.  Now, did you look at him when he did this or were you looking away from him?

A  I won't looking at him.

Q  Okay.  Now, how do you know it was his private part?  Can you tell me that?

A  No.

Q  What happened when he put his private part in your private part, what happened next?

A  I felt wet stuff coming down my legs.

The record clearly establishes that Crump was afforded a full opportunity to conduct an effective cross-examination and that the child substantially responded to the questioning.  Upon this record, we do not know what information he was trying to elicit from the child that he did not elicit.  Thus, the trial judge did not err in refusing to strike the child's testimony.

III.

"[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which [the accused] is charged."  In re Winship, 397 U.S. 358, 364 (1970).  Thus, when the question of the sufficiency of the evidence is raised on appellate review, we must determine whether a reasonable fact finder could have found from the evidence before it that guilt

had been proved beyond a reasonable doubt.  Furthermore, when reviewing the sufficiency of the evidence, we view the evidence in the light most favorable to the Commonwealth, granting all reasonable inferences fairly deducible from the evidence. Higginbotham v. Commonwealth, 216 Va. 349, 352, 218 S.E.2d 534, 537 (1975).

Crump argues that the evidence in its totality was inherently incredible.  He contends that the child's testimony that he urged her to blame her uncle was contradictory and, therefore, unreliable.  In support of this contention, he notes that the evidence established that when the rape was reported, the child initially named her uncle as the perpetrator.  Crump also contends that significant portions of the evidence were contrary to human experience.  In particular, he points to the child's testimony that Crump never spoke to her during the act, that she began doing her homework following the incident, and that she did not try to run away and call anyone.  Crump also notes that the evidence shows that the child and her mother continued to live in the house with him for over two months before the crime was reported.

In addition, Crump contends that the mother's testimony fails to corroborate the child's testimony and only serves to render it more incredible.  He argues that the mother's testimony that the child used the phrase, "child molested," was unbelievable.  Crump also argues the mother's reasons for waiting

two months to report the rape and her inaction when the child's uncle was charged for the crime rendered her testimony incredible.

The child's testimony established beyond a reasonable doubt the facts necessary to uphold the conviction. The child testified with apparent difficulty but without contradiction that Crump raped her. The child testified that she was penetrated and that she experienced pain. She also described manifestations of sexual intercourse. "[T]he child's testimony alone, if believed by the [trier of fact], was sufficient to support [Crump's] conviction, even in the absence of corroborating physical or testimonial evidence." Love v. Commonwealth, 18 Va. App. 84, 90, 441 S.E.2d 709, 713 (1994).

The mother's testimony, however, corroborates parts of the child's account. The mother's testimony concerning the child's use of the term "child molested," the mother's failure to earlier report the incident, and the mother's response to the uncle's arrest were all matters that affected her credibility.

> It is [the fact finder's] function to judge the credibility of the witnesses and the weight of their evidence. The [fact finder] has the opportunity to observe the witnesses' demeanor while testifying, to consider their interest in the outcome of the case, and to determine from all the circumstances of the case which witnesses are more believable.

Gray v. Commonwealth, 233 Va. 313, 344, 356 S.E.2d 157, 174, cert. denied, 484 U.S. 873 (1987).

The inconsistencies in the child's testimony and the

mother's testimony are not such as to render the evidence incredible as a matter of law.  The child consistently testified to the facts which establish the crime, and the trial judge believed her testimony.  See <u>Pugliese v. Commonwealth</u>, 16 Va. App. 82, 92, 428 S.E.2d 16, 24 (1993).  Furthermore, we cannot say that the child's account of Crump's behavior or her response to that behavior presented an account of events contrary to human experience.

For these reasons we affirm the conviction.

<u>Affirmed</u>.