COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:   Judges Huff, O'Brien and White
Argued at Norfolk, Virginia


JOHN BLOUNT, JR.

                                                    MEMORANDUM OPINION[*] BY
v.        Record No. 0943-21-1                      JUDGE KIMBERLEY S. WHITE
                                                    DECEMBER 20, 2022

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF SUFFOLK
L. Wayne Farmer, Judge

Kevin E. Calhoun (Charles C. Cosby, Jr., on brief), for appellant.

Mason D. Williams, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


John Blount, Jr., appeals the trial court's September 3, 2021 orders convicting him of rape,

carnal knowledge of a child between the age of thirteen and fifteen, and taking indecent liberties

with a child less than fifteen years of age and sentencing him to forty years' incarceration. Blount

argues that the evidence was insufficient to sustain his convictions because the victim's testimony

was "inherently incredible." He also contends that the trial court erred by denying his motion for a

new trial based on evidence discovered after trial. For the following reasons, we affirm the trial

court's judgment.

BACKGROUND

On appeal, we recite the facts "in the 'light most favorable' to the Commonwealth, the

prevailing party in the trial court." *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022)

(quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)). Doing so requires that we "discard the

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom." *Cady*, 300 Va. at 329 (quoting *Commonwealth v. Perkins*, 295 Va. 323, 323-24 (2018)).

In the fall of 2016, fourteen-year old V.B. lived with her grandfather, Herbert Brown, and great-aunt, Mary Brown. At 9:30 p.m. on September 5, 2016, Mary told V.B. to go to bed. V.B. walked into the bedroom she shared with Mary, turned off the light, and fell asleep on the bed. Sometime before 10:00 p.m., Herbert and Mary were in the living room when V.B.'s uncle, Blount, arrived and asked for V.B. When Mary told Blount that V.B. had gone to bed, he left Mary and Herbert in the living room. Mary assumed Blount had gone to the bathroom, and Herbert thought he was going to a closet where Blount stored some of his clothing.

At trial, V.B. testified that after she fell asleep Blount walked into her bedroom, woke her up, and told her to remove her pants. She pulled her shorts and underwear "halfway down" because Blount said he would hurt her if she refused. V.B. saw Blount's penis, which she described as "down" but did not know whether it was hard or soft, and knew he put it inside her vagina because she "felt it." After "less than five minutes" Blount "finished" and told V.B. he had "bust[ed] a nut."

When V.B. and Blount realized that Mary was "about to" enter the bedroom, Blount withdrew his penis and jumped to a laundry basket in the corner. Mary opened the door and stood in the doorway, but a "dresser TV stand" blocked her view of Blount. Blount told Mary that he was looking for his phone's battery and SIM card because V.B. threw them into the laundry basket. Mary asked V.B. why her pants were down, and V.B. said that she took them off because she was hot.

At trial, V.B. testified that Blount previously had "raped" her at a different house about a month before September 5, 2016. During that incident, Blount instructed her to remove her pants,

- 2 -

and she complied because she was scared. As she lay on her back on a "high bed," Blount stood behind her and put his penis inside her vagina. On cross-examination, V.B. could not remember whether she told medical personnel that the first incident happened two days before the second one. She also did not remember whether she told Suffolk Police Detective Tiffany Whitten that she was standing during the first incident.

Mary testified that about five minutes after Blount arrived and left the living room, she walked to the bathroom and saw that V.B.'s bedroom light was on. She opened the door and saw V.B. sitting beside the bed with her shorts "down around her ankles," looking "real[ly] sad." Mary asked why V.B. was not in bed, and she replied that Blount had come into the bedroom. Mary noticed dirty clothes on the floor beside a laundry basket and asked why they were on the floor. Blount replied that he was looking for his "battery and his SIM card," which V.B. "threw" into the basket. While keeping his back toward Mary, Blount picked up the clothes, and left the bedroom by backing up so that Mary could not see his front.

Herbert testified that Blount returned to the living room "a couple minutes" after Mary left and stood against a wall for "maybe a minute" before leaving without speaking. Herbert could not see Blount's front. After Blount left, V.B. came into the room and "fell to her knees," "crying," and told Mary and Herbert that Blount had "raped" her.

During interviews with police on the night of September 5, 2016, V.B. was "sad," "quiet," and "stoic," "hollow almost." She told police that Blount had "raped" her that evening and during the "weekend prior." Mary told police that Blount had returned her clothes to the laundry basket before leaving her room. V.B. also spoke to police three days later and said that she had been standing during the first incident and had pulled her pants "down all the way."

The trial court qualified Dr. Michelle Clayton as an expert in child abuse and neglect. Dr. Clayton performed a pediatric forensic evaluation on V.B. the day after the second incident.

She testified that although there was no sign of any trauma to V.B.'s vaginal area, it is "very commonplace" for examinations to show no signs of "acute injury, even when a child or a teenager presents pretty soon after a sexual assault."

Reyna Nikolaus, a forensic nurse examiner, examined and spoke with V.B. the morning of September 6, 2016. V.B. told Nikolaus about two incidents with Blount that occurred on September 3 and 5, 2016. Nikolaus used a physical evidence recovery kit to collect physical evidence from V.B. Before coming to the hospital, however, V.B. had "urinated" and "washed or wiped her genitals." Nikolaus explained that "washing and wiping of the genital area" could "wash away or wipe away any evidence that may have been" present.

Brenden Graney, a forensic scientist with the Commonwealth's Department of Forensic Science, analyzed the evidence collected by Nikolaus but did not find any blood, seminal fluid, or spermatozoa. Graney explained that various factors affect whether DNA evidence would be found, including urinating and "wiping down there."

Blount testified that he had visited V.B.'s house the evening of the second incident to retrieve some "tax forms" he stored there. He entered V.B.'s bedroom to seek her help with his cell phone. Although V.B. was already in bed, she responded when he turned on the light and called her name. He claimed that he was in the house for "about five to six minutes" and denied that he had exposed his penis to V.B. or raped her. V.B. was "covered up" in a blanket when he went into her room, and he told police that she "never unwrapped herself." He did not explain why V.B.'s pants were down when Mary entered the room.

Latasha White, Blount's niece, testified that she drove Blount to V.B.'s house on the night of the second incident. Blount went inside but returned to the car "four or five minutes" later. Finally, Blount's nephew, sister, and girlfriend all testified that V.B. had a reputation for not "telling the truth."

Blount moved to strike the evidence at the conclusion of the Commonwealth's case-in-chief and at the close of all the evidence; the trial court denied both motions. After argument by counsel, the jury convicted Blount of rape, carnal knowledge of a child between the age of thirteen and fifteen, and taking indecent liberties with a child less than fifteen years of age, all as to the second incident.[1]

On December 30, 2020, Blount moved to set aside the verdicts, arguing that V.B.'s testimony was inherently incredible. After a hearing on the motion, the trial court found that although "there were some minor inconsistencies in [V.B.'s] testimony," she was a credible witness and "testified with real emotion." Emphasizing Mary's testimony that V.B. looked "sad" and her pants were "around her ankles," the trial court found that Blount had no explanation when he was questioned about V.B.'s pants being down. The court credited Mary's testimony that Blount "intentionally kept his back to her the whole time," and found that V.B. was "tearful" and "made her allegations immediately after the event." The court found that "the jury had an opportunity to hear" the witnesses, many of whom testified "solely" to attack "the veracity of the victim." Accordingly, the court denied the motion to set aside the verdict.

On January 6, 2021, Blount moved for a new trial based on after-discovered evidence. At a hearing on the motion, Willetta Holmes, Blount's sister and V.B.'s aunt, testified that she "arrived late after the court case was over" and her "family was in the hallway" outside the courtroom. She overheard V.B., who was talking to three other family members, give a "sigh of relief" and state that "she can stop lying" and "rest because she [did not] have to lie anymore." Holmes asked V.B. what she meant, but Mary intervened and threatened to call the police and told V.B. to "sit down and shut

---

[1] The court granted the Commonwealth's motion to *nolle prosequi* charges of taking indecent liberties with a minor and aggravated sexual battery, both arising from the first incident, and aggravated sexual battery arising from the second incident. The jury acquitted Blount of rape and carnal knowledge of a child between the age of thirteen and fifteen, both charges arising from the first incident.

her mouth." Holmes understood V.B. to mean that V.B. was glad that she did not "have to lie anymore about what she was saying about" Blount. Holmes could not remember when this happened but was certain she arrived too late to hear any of the trial. Holmes did not report V.B.'s statement to a deputy, a Commonwealth's attorney, or Blount's attorney. Instead, she told her sister, mother, and aunt over the next few days. Holmes was the sole witness to testify at the hearing, despite her allegation that other family members were present at the time the statements were made.

V.B. testified that she left court after her trial testimony and did not return during the trial. She had not seen Holmes or talked with family members about the case in the hall. In addition, she asserted that she had not returned to the courthouse except for a prior sentencing hearing and the current hearing on Blount's motion for a new trial. She denied admitting that she had lied and insisted that she had testified truthfully at Blount's trial.

Blount argued that Holmes's testimony addressed V.B.'s credibility and the trial court should award a new trial based on the after-discovered evidence. The Commonwealth responded that V.B.'s denial of Holmes's testimony was corroborated by her decision not to return to court after her testimony. Further, V.B.'s "body language" and demeanor during her hearing testimony bolstered her credibility. During her testimony, V.B. "stiffened up," "would not look at her uncle" but "looked the Commonwealth directly in the eye," and "looked straight ahead when she was cross-examined during this hearing," which revealed "how hard it is for her even today to talk about what happened."

The trial court found that the evidence showed an "allegation by a single witness" of "an out-of-context statement" by V.B. that she could "stop lying" and could "rest." Further, the court found that the statement was not a recantation, as V.B. had not "stated with certainty that she had not told the truth" while testifying. The court recounted defendant's attempts at trial to attack

V.B.'s credibility, including "a litany of witnesses" who testified "they didn't believe her." In addition, the court found that because the jury, after having "opportunity to judge [the] credibility of the witnesses," including Blount, found him guilty beyond a reasonable doubt, the alleged statements by V.B. would not have been "likely to produce a different verdict." Accordingly, the court denied the motion for a new trial and sentenced Blount in accordance with the jury's recommendation. This appeal follows.

## ANALYSIS

### A. Sufficiency of the Evidence

Blount argues that "inconsistencies" between V.B.'s testimony, her prior statements, and the testimony of other witnesses rendered the Commonwealth's "evidence inherently incredible and not worthy of belief." Blount contends that he did not have enough time to perpetuate the offenses as V.B. described, that it was "physiologically impossible" for him to commit the offenses given V.B.'s testimony that his penis was "down," and that alleged inconsistencies exist between V.B. and Mary's testimony regarding where he and V.B. were when Mary entered the room, the location of V.B.'s underwear during the incident, and how he exited the room. He further asserts that V.B.'s testimony that she pulled her pants and underwear "halfway down" is "implausible" because that would have "hinder[ed] [his] access" and "ma[d]e it much more difficult" "to insert his penis into her vagina." Finally, Blount also emphasizes the inconsistencies in V.B.'s statements about (1) how much time separated the two incidents in which Blount "raped" her, and (2) her relative body position during the first alleged incident. Given the above circumstances, Blount concludes that the Commonwealth's evidence was "inherently incredible."

"When reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (alteration in original) (quoting

*Smith v. Commonwealth*, 296 Va. 450, 460 (2018)). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *Id.* (quoting *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018)).

It is well-established that "[d]etermining the credibility of witnesses . . . is within the exclusive province of the [fact finder], which has the unique opportunity to observe the demeanor of the witnesses as they testify." *Dalton v. Commonwealth*, 64 Va. App. 512, 525 (2015) (second alteration in original) (quoting *Lea v. Commonwealth*, 16 Va. App. 300, 304 (1993)). Moreover, "the conclusions of the fact finder on issues of witness credibility may be disturbed on appeal only when we find that the witness' testimony was 'inherently incredible, or so contrary to human experience as to render it unworthy of belief.'" *Ragsdale v. Commonwealth*, 38 Va. App. 421, 429 (2002) (quoting *Ashby v. Commonwealth*, 33 Va. App. 540, 548 (2000)). "Evidence is not 'incredible' unless it is 'so manifestly false that reasonable men ought not to believe it' or 'shown to be false by objects or things as to the existence and meaning of which reasonable men should not differ.'" *Gerald v. Commonwealth*, 295 Va. 469, 487 (2018) (quoting *Juniper v. Commonwealth*, 271 Va. 362, 415 (2006)).

"A legal determination that a witness is inherently incredible is very different from the mere identification of inconsistencies in a witness' testimony or statements. Testimony may be contradictory or contain inconsistencies without rising to the level of being inherently incredible as a matter of law." *Kelley v. Commonwealth*, 69 Va. App. 617, 626 (2019) (citing *Juniper*, 271 Va. at 415); *see Manson v. Brathwaite*, 432 U.S. 98, 116 (1977) ("[E]vidence with some element of untrustworthiness is customary grist for the jury mill."). Instead, such inconsistencies are appropriately weighed and "'resolved by the fact finder,' not the appellate court." *Kelley*, 69 Va. App. at 626 (quoting *Towler v. Commonwealth*, 59 Va. App. 284, 291 (2011)).

Moreover, it is well-established that "a conviction for rape and other sexual offenses may be sustained solely upon the uncorroborated testimony of the victim." *Wilson v. Commonwealth*, 46 Va. App. 73, 87 (2005) (citing *Garland v. Commonwealth*, 8 Va. App. 189, 191-93 (1989)). "[B]ecause sexual offenses are typically clandestine in nature, seldom involving witnesses to the offense except the perpetrator and the victim, a requirement of corroboration would result in most sex offenses going unpunished." *Id.* at 88 (citing *Garland*, 8 Va. App. at 192).

Blount points to nothing that renders the Commonwealth's evidence inherently incredible as a matter of law. V.B. unequivocally testified that Blount entered her bedroom and demanded that she remove her underwear. She saw his exposed penis, which she described as being "down," before he penetrated her vagina with it, and she was sure it was inside her vagina because she "felt it." Although Blount points to alleged inconsistencies in V.B.'s testimony and statements, none of those inconsistences rendered the Commonwealth's evidence unworthy of belief as a matter of law. Instead, they were appropriately submitted to the jury, which, after considering the inconsistencies in the context of the evidence, credited V.B.'s account.

Despite there being no requirement of corroboration, V.B.'s testimony, in fact, was corroborated by Mary, who testified that V.B.'s shorts were around her ankles when Mary entered the bedroom. Moreover, as the trial court found, Blount had no satisfactory explanation for why V.B.'s shorts were around her ankles when Mary entered the room. Further, V.B.'s testimony was corroborated by Mary and Herbert who described Blount's reluctance to show his front after he had been alone with V.B.

"When the law says that it is for triers of the facts to judge the credibility of a witness, the issue is not a matter of degree. So long as a witness deposes as to facts [that], if true, are sufficient to maintain their verdict," and "[i]f the trier of the facts sees fit to base the verdict upon that testimony[,] there can be no relief in the appellate court." *Smith v. Commonwealth*, 56 Va. App.

711, 718-19 (2010) (quoting *Swanson v. Commonwealth*, 8 Va. App. 376, 379 (1989)). *See Crump v. Commonwealth*, 20 Va. App. 609, 618 (1995) ("[T]he child's testimony alone, if believed by the [trier of fact], was sufficient to support [Crump's] conviction, even in the absence of corroborating physical or testimonial evidence." (alterations in original) (quoting *Love v. Commonwealth*, 18 Va. App. 84, 90 (1994))). Thus, the Commonwealth's evidence was competent, not inherently incredible, and sufficient to sustain appellant's convictions.

### B. Motion for New Trial

Blount argues that in denying his motion for a new trial based on after-discovered evidence, the trial court erroneously found that he had not proved "(1) that the evidence was discovered subsequent to trial, and (2) that the evidence was material and should produce a different result at a different trial." He contends that the evidence demonstrated that Holmes did not tell his counsel about the statement "while the trial was still ongoing" and that because his counsel "was not made aware of these statements during the trial, they must have been discovered after the trial concluded." Next, he argues that the evidence in Holmes's testimony was material because it attacked V.B.'s credibility, which "was the main issue at trial."

> We have repeatedly and consistently stated that motions for new trials based on after-discovered evidence are addressed to the sound discretion of the trial judge, are not looked upon with favor, are considered with special care and caution, and are awarded with great reluctance. A party who seeks a new trial based upon after-discovered evidence bears the burden to establish that the evidence (1) appears to have been discovered subsequent to the trial; (2) could not have been secured for use at the trial in the exercise of reasonable diligence by the movant; (3) is not merely cumulative, corroborative or collateral; and (4) is material, and such as should produce opposite results on the merits at another trial. The moving party must establish each of these mandatory criteria.

*Garnett v. Commonwealth*, 275 Va. 397, 416-17 (2008).

Here, Holmes's testimony provided no context for the statements she attributed to V.B. As the trial court found, nothing in Holmes's testimony demonstrates that V.B. was recanting her trial testimony or admitting that she had testified falsely. Moreover, although Holmes testified that V.B. made these statements to three people, Holmes was the "single witness" to the statements. Indeed, V.B. adamantly contradicted Holmes's testimony and insisted that she testified truthfully at trial. Thus, Holmes's testimony provided what amounted to a speculative attack on V.B.'s credibility. As the trial court noted, this speculative attack came after "a litany of witnesses" who testified "they didn't believe her" at trial. Accordingly, the trial court, which had the "opportunity of seeing and hearing the witness whose testimony is brought under attack," did not abuse its discretion in denying Blount's motion for a new trial after concluding that the statements Holmes claimed to have heard were not material.[2] *In re Johnson*, 47 Va. App. 503, 511 (2006) (quoting *Lewis v. Commonwealth*, 193 Va. 612, 625 (1952)).

CONCLUSION

For the foregoing reasons, the trial court's judgment is affirmed.

*Affirmed.*

---

[2] "[T]he doctrine of judicial restraint dictates" that appellate courts "decide cases 'on the best and narrowest grounds available.'" *Commonwealth v. White*, 293 Va. 411, 419 (2017) (quoting *Commonwealth v. Swann*, 290 Va. 194, 196 (2015)). In this case, the best and narrowest ground is our conclusion that the statements were not material. Accordingly, we do not address Blount's argument that the statements were discovered after trial.